## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD S. SABATINI,              :

                    :

           **Plaintiff**     :

                    :    **CIVIL NO. 99-CV-2393**

       v.             :

                    :

ROBERT J. REINSTEIN, DEAN OF TEMPLE :
UNIVERSITY SCHOOL OF LAW AND
VICE PRESIDENT, TEMPLE UNIVERSITY; :
TEMPLE UNIVERSITY SCHOOL OF LAW, :    **JURY TRIAL DEMANDED**
and TEMPLE UNIVERSITY,       :

                    :

        **Defendants.**    :

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.**    **Findings of Fact**

    **A.**    **Background of Lawsuit**

        1.    Plaintiff Donald S. Sabatini ("Plaintiff") is a 1995 graduate of the James

E. Beasley School of Law (the "Law School"). (Trial Transcript dated June 29, 2004

(hereinafter, "T.T.-1"), 15). As a law student, Plaintiff was a member of the Western Heritage

Society ("WHS"), a political group founded and led by the Plaintiff's friend and fellow law

student, Lincoln Herbert ("Herbert"). (Id. at 15, 23). Plaintiff has come to believe that he has

been persecuted both by the Law School and Temple University ("Temple" or the "University")

because of his affiliation with WHS.

        2.    Plaintiff filed this lawsuit against Robert Reinstein, Dean of the Law

School and a Vice President of Temple University ("Dean Reinstein"); the Law School, and

Temple in May, 1999. In his original complaint, Plaintiff sought to recover damages under 42

U.S.C. § 1983 for two incidents in which he claimed that Dean Reinstein, the Law School, and Temple violated his civil rights under the Pennsylvania Constitution and the United States Constitution, by prohibiting him from distributing leaflets on Temple property at the 1997 and 1998 Law School graduation ceremonies. (Complaint). Plaintiff later filed an amended pleading in which he set forth similar claims relating to the 1999 Law School graduation ceremony. (Second Amended Complaint).

3.      This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.

4.      Plaintiff's claims for violation of his state constitutional rights were dismissed by a Memorandum and Order of this Court entered August 20, 1999. (Memorandum and Order entered August 20, 1999).

5.      This Court later granted summary judgment in favor of the Defendants with respect to Plaintiff's claims relating to the 1999 Law School graduation ceremony, as well as all of Plaintiff's claims under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and all of Plaintiff's claims against Dean Reinstein. (Memorandum and Order dated July 20, 2000). In ruling on Defendants' motion for summary judgment, this Court further held that the Temple property where the Plaintiff sought to distribute leaflets during the graduation ceremonies was a non-public forum. (Id. at 5-6). Accordingly, the only remaining claims which this Court must decide are the Plaintiff's claims against the Law School and Temple[1], for alleged violations of his First Amendment rights when he was prohibited from distributing leaflets on Temple property constituting a non-public forum at the 1997 and 1998 Law School graduation ceremonies.

---

[1]      The Law School and Temple are collectively referred to as "Defendants."

6.     This Court has considered the testimony and evidence admitted during the trial of this matter held on June 29 and 30, 2004, including the admitted exhibits.

**B.     The 1997 Graduation Incident**

7.     The 1997 Law School graduation ceremony took place at McGonigle Hall, a Temple facility located on Broad Street in North Philadelphia. (T.T.-1 at 26).  The McGonigle Hall facility, which was normally used as a basketball arena and gymnasium (Id. at 112), consists of a building containing an arena and a lobby that is situated between the arena and a row of front doors (Id. at 48), as well as an outdoor landing  (Id. at 33).  The outdoor landing to McGonigle Hall is elevated approximately three to four feet above the level of the adjacent public sidewalk and street (Id. at 33-34).  Two sets of steps connect the outdoor landing with the public sidewalk. (Ex. P-6).

8.     The set of steps on the northern side of the McGonigle Hall face east onto Broad Street, and connect directly to a concrete public sidewalk that runs along Broad Street. (Ex. P-6).  The southern set of steps, on the other hand, face south, and connect to a brick sidewalk.  (Id.; T.T.-1 at 140-1, 166)     The brick sidewalk is immediately adjacent, and connected, to the concrete sidewalk that runs along Broad Street.  (T.T.-1 at 140-1, 166).  All pedestrians, including those using the southern set of steps, must cross the concrete sidewalk in order to enter the McGonigle Hall facility.  (T.T.-1 at 74).

9.     Plaintiff went to McGonigle Hall on the occasion of the 1997 Law School graduation ceremony, intending to distribute leaflets to people as they entered the ceremony. (T.T-1. at 24).  Plaintiff's leaflets were critical of Dean Reinstein, the Law School, and Temple, and accused all three of having a poor civil rights record.  (Ex. P-1).

10.     There is some dispute as to exactly where the Plaintiff stationed himself to distribute leaflets. (Compare T.T.-1 at 26-7 with T.T.-1 at 116). However, it is not disputed that the Plaintiff's position was on Temple property at the McGonigle Hall facility.

11.     As he distributed leaflets, Plaintiff was approached by Robert Lowell ("Lowell"), the head of the Investigations Unit of the Temple Campus Police. (T.T.-1 at 31, 116). Lowell told the Plaintiff that distribution of leaflets was not permitted on Temple's private property, and directed him to the public sidewalk at the bottom of the southern set of steps to McGonigle Hall. (Id. at 32-33, 116-9). After a brief argument, Plaintiff complied with Detective Lowell's directive, and resumed distributing leaflets on the brick sidewalk. (Id. at 32-33, 116).

12.     Plaintiff claims that as he distributed leaflets at the bottom of the steps, he was approached by Campus Police Detective Gail Johnson ("Johnson" or "Detective Johnson"), who told him that the brick sidewalk was Temple property, and directed him to the concrete sidewalk to distribute his leaflets. (T.T.-1 at 35-6). Plaintiff further claims that he complied with this directive, and continued distributing his leaflets on the concrete public sidewalk by the southern set of steps until just before the ceremony started, when the crowd thinned. (Id. at 37-39). However, Plaintiff testified that his effectiveness in distributing leaflets to his target audience from this position was limited because much of the pedestrian traffic "drifted" onto to the brick sidewalk. (Id.). Plaintiff did not attempt to avoid this difficulty by moving over to the northern set of steps, despite his own acknowledgement that half of the people entering McGonigle Hall were using the northern set of steps, and that he could have reached all of these people easily from the public sidewalk at the bottom of the northern set of steps. (Id. at 37-8, 74).

4

13.     The Temple Campus Police used no physical force, nor any threat of physical force, against the Plaintiff on this occasion. (T.T.-1 at 72). Plaintiff suffered no physical, financial or other harm as a result of the incident. (Id.).

## C.     The 1998 Graduation Incident

14.     The 1998 Law School graduation ceremony was held at the Liacouras Center, which is located approximately one block south of McGonigle Hall on Broad Street in North Philadelphia. (T.T. at 41). The Liacouras Center building contains an arena, as well as a lobby that is situated between the arena and the front doors to the building. (Ex. P-7; T.T.-1 at 48). Just outside the front doors is a single set of steps that face Broad Street and connect the front doors of the building with the public sidewalk. (Ex. P-7; T.T.-1 at 48).

15.     The witnesses who testified at trial gave differing accounts of the 1998 graduation incident. In particular, the Campus Police who were involved in the 1998 incident do not recall encountering the Plaintiff on that occasion, and testified that they dealt entirely with Lincoln Herbert. (T.T.-1 at 128, 134, 149, 157). Nonetheless, Defendants have agreed not to dispute that the Campus Police encountered Plaintiff at the 1998 graduation.

16.     In 1998, Plaintiff again went to the Law School graduation ceremony in order to distribute leaflets to people as they entered the ceremony. (T.T.-1 at 41). Plaintiff's leaflets on this occasion were similar to the leaflets he distributed at the 1997 ceremony, in that they criticized Dean Reinstein, the Law School, and Temple as having a poor civil rights record. (Ex. P-2).

17.     Plaintiff stationed himself in the lobby of the Liacouras Center, where he began to hand out leaflets. (T.T.-1 at 43). He was accompanied by Lincoln Herbert, who was also distributing leaflets. (Id.). After distributing leaflets for a while, the two were approached

5

by Lowell, and by Campus Police Chief William Bergman ("Bergman"). (Id. at 46-7, 121-2, 150-1). Bergman and Lowell told the two that leafleting was not permitted on Temple property, and directed them outside. (Id.). After an argument in which the Plaintiff and Herbert refused to move except "under threat of arrest," the two were directed outside. (Id.). Although Herbert remained on the steps distributing leaflets (Id. at 50), Plaintiff claims that he complied with Bergman's directive to go to the public sidewalk at the bottom of the steps to distribute his leaflets. (Id. at 47-8). Plaintiff was permitted to distribute leaflets on the public sidewalk; however, he claims that his access to his target audience was impaired because he was at the bottom of the steps, rather than at the top of the steps or inside the building. (Id. at 50-51).

18. The Campus Police did not use force or the threat of force against either Plaintiff or Herbert on this occasion. Their only "threat of arrest" was uttered in response to the Plaintiff and/or Herbert's demands. (T.T.-1 at 75). The Plaintiff sustained no physical, financial or other harm as a result of this incident.

D. **Plaintiff's Claim of Content-Based Discrimination**

19. Plaintiff presented no evidence that anyone else was ever permitted to distribute leaflets or engage in any other forms of public protest on Temple property at either McGonigle Hall or the Liacouras Center. To the contrary, the evidence showed that the Campus Police have not knowingly permitted anyone other than Plaintiff and Herbert to do so. (T.T.-1 at 71, 125, 152, 172, 185).

20. Despite the absence of any evidence that he and Herbert were treated differently than anyone else with respect to leafleting or protesting at these two locations, Plaintiff has persisted with his claim that he was subjected to discrimination on the basis of the contents of his leaflets. In support of this claim, Plaintiff testified that some of the Campus

Police looked at his leaflets before he was ejected from Temple property. (T.T.-1 at 71, 75-6). Plaintiff therefore testified to his belief that after discerning the contents of his leaflets, the Campus Police ejected him in accordance with a policy of unfair treatment of WHS and its members. (Id.).

21.     Plaintiff's claim that a policy of unfair treatment of WHS and its members existed, as well as his claim that the police acted in accordance with such a policy in removing him from Temple property, are supported by nothing other than the Plaintiff's own baseless speculation. According to the Plaintiff's own testimony, there is no evidence of any specific written policy or verbal directive being issued at Temple to treat WHS unfairly. (T.T.-1 at 85-6). Instead, it appears that the Plaintiff believes that a general animosity existed at Temple toward WHS, and that this animosity was somehow transmitted to the Campus Police and affected their actions on the dates in question.

22.     During its existence at Temple, WHS posted a number of flyers both inside and outside the Law School in which the group expressed controversial views, and even attacked individual students by name. (T.T.-1 at 195, Trial Transcript dated June 30, 2004 (hereinafter, "T.T.-2") at 71-2). These posters gave rise to a number of student complaints to Law School and University administrators. (T.T.-1 at 195, T.T.-2 at 15-6, 46, 72). These administrative officials refused to censor WHS in response to these complaints, and in fact, they defended WHS's free speech rights in a number of ways. (T.T-1 at 195-7; T.T.-2 at 15-6, 46-7, 73-7; Ex. D-11).

23.     A wealth of evidence showed that Law School and University officials made a genuine effort to ensure that WHS's expressive activities were not curtailed. Nonetheless, Plaintiff testified to the occurrence of a number of discrete incidents during WHS's

7

existence, as evidence of a policy of anti-WHS discrimination on the part of the Law School and University administrations. Plaintiff's testimony has failed to establish the existence of any such general, wide-ranging antagonism affecting all parts of the University. In addition, not one of the incidents to which the Plaintiff testified represents an instance of intentional suppression of WHS's expressive activities. Instead, the incidents were merely innocuous and unconnected events which the Plaintiff has chosen to view through the lens of a "liberal-conspiracy" theory.

### Removal of Easels from the Law School Entrance

24.     One of the incidents to which Plaintiff referred as circumstantial evidence of the Law School administration's hostility toward WHS was the removal of some easels which had previously been placed just inside the main entrance to the Law School. According to the Plaintiff, although various groups had used easels to post notices by the entrance to the Law School "for years," the easels were suddenly removed by order of the Law School administration just after WHS added its own easel to the group. (T.T.-1 at 56).

25.     The testimony of Dean Reinstein, Assistant Dean Adelaide Ferguson ("Ferguson"), and Assistant Dean Deborah Feldman ("Feldman") of the Law School, all of whom participated in the decision to remove the easels from the Law School entrance, has established that the removal of the "easel farm" was not targeted at WHS in any way. Instead, the easels were only removed when they became so numerous that they began to obstruct access to the main doors to the Law School, particularly for a blind law professor and some disabled students, and to hinder the security guard's ability to check people in as they entered the Law School building. (T.T.-1 at 197-200; T.T.-2 at 51-2, 56, 85-6). In addition, Feldman received a complaint from the fire marshal that the easels presented a safety hazard. (T.T.-2 at 52). The

easels were moved back to a location that was out of the way of the main doors, but still visible from the doors, in response to these concerns. (T.T.-1 at 200; T.T.-2 at 86).

26.     Each of the three administration officials who were involved in the decision to move the easels testified that WHS's easel was not a motivating factor in the decision. (T.T.-1 at 200; T.T.-2 at 52, 86). In fact, none of the three was able to recall whether the timing of the decision coincided with WHS's placement of an easel by the Law School entrance—a fact which makes their lack of intent to discriminate against WHS all the more apparent. (T.T.-1 at 210; T.T.-2 at 52, 57, 107-8). Further evidence that WHS was not treated unfairly on this occasion is the fact that WHS was not singled out, as all of the easels, were moved. (T.T.-1 at 200; T.T.-2 at 52, 86). Accordingly, the removal of the easels from the entrance to the Law School does not represent an instance of content-based or otherwise unfair treatment, intentional or unintentional, of WHS.

### Charge for Setup of Faculty Meeting Room

27.     Plaintiff claimed that on another occasion, WHS asked to use a "multi-purpose" room to hold a lecture, but was subjected to an exorbitant charge for the services of the maintenance staff in rearranging the furniture for the lecture. (T.T.-1 at 58-60). Although the Plaintiff testified that WHS "didn't necessarily object to" the charge itself, they objected to the amount of the charge, which was "close to a thousand dollars." (Id. at 59). Plaintiff obliquely indicated his belief that the Law School administration intentionally inflated the charge in an attempt to outstrip the small budget WHS received from the Student Bar Association. (Id. at 107-8). Plaintiff testified that because of the amount of the charge, WHS was unable to hold the lecture in the requested room. (Id. at 60).

28.     Again, the Plaintiff's belief that WHS was subjected to unfair treatment is unsupported by his own testimony, while it is contradicted by the testimony of various Law School administrators who were involved in, or aware of, the incident.  By the Plaintiff's own admission, when WHS requested a room for the event in question, all of the lecture rooms in the Law School were unavailable for the date and time when WHS wanted to hold its event. (T.T.-1 at 104; see also T.T.-1 at 227; T.T.-2 at 83).  Therefore, a faculty meeting room had to be requested for the date and time when WHS wanted to hold its event.  (T.T.-1 at 83, 223). Because this room contained furniture that was set up for meetings, it had to be rearranged for the lecture event. [2]   (T.T.-1 at 83, 223; T.T.-2 at 53, 83). Temple's facilities management department imposed a charge for the rearranging of the furniture, which charge was passed on to WHS just as it was passed on to other groups that requested the service. (T.T.-1 at 224-5; T.T.-2 at 53, 83-4).  The amount of the charge, which was determined by the facilities management department, was simply conveyed to WHS by Dorothy Lee (the Law School's Director of Special Events) and Feldman. (T.T.-1 at 224-5; T.T. at 53-4, 58-9).

29.     The amount of the fee for rearranging the faculty meeting room was set by Temple's facilities management department, rather than by anyone within the Law School administration.  (T.T.-1 at 224; T.T.-2 at 53-4).  There is no evidence that the facilities management department bore WHS any ill will, nor is there is any evidence that anyone within the Law School administration or the facilities management department inflated the fee in order to make it more difficult for WHS to afford.  Under cross-examination, Plaintiff admitted that he

---

[2]      WHS could have completely avoided the imposition of any charge by simply making a timely request for a lecture room in which no furniture would need to be moved, rather than delaying until the faculty meeting room was the only available option. (See T.T.-1 at 229).

did not know whether the fee was artificially inflated, as he did not verify the amount by contacting the facilities department, nor did he check to see if others were subjected to similar charges for the use of the same room. (T.T.-1 at 84, 104). Any inflation of the facilities management fee appears to have been done by Plaintiff's hearsay testimony, rather than by anyone within the Law School administration, as Feldman testified that she recalled relating the fee to Herbert, not Plaintiff, and that the fee was $500, rather than "close to a thousand dollars." (T.T.-2 at 58-9). Finally, Plaintiff's theory that the administration was trying to outstrip WHS's budget makes no sense in light of his own testimony that WHS had other sources of funding. (T.T.-1 at 19, 107). Plaintiff's assumption that the "excessive" charge represents an example of unfair treatment of WHS is entirely unjustified.

### WHS's Request for a Second Bulletin Board

30.     Plaintiff also testified that in 1995, when he was serving as WHS's president, he noticed that the Environmental Law Council (another student group at the Law School) had taken over the use of a bulletin board that was situated next to its regular bulletin board. (T.T.-1 at 57). Plaintiff further testified that when he noticed this, he submitted two letters to Assistant Dean Ferguson in which he requested that WHS be granted the use of a bulletin board that was adjacent to WHS's own bulletin board. (Id. at 57-8). Plaintiff complains that these letters went unanswered. (Id. at 58).

31.     Plaintiff's complaint concerning WHS's not being granted a second bulletin board in this location is notably at odds with his additional complaint that WHS's existing bulletin board was not easily seen due to its location. (Compare T.T.-1 at 56-8 with T.T.-1 at 99-100). Moreover, Plaintiff's own testimony refutes the notion that Ferguson's failure to grant WHS a second bulletin board represents an instance of intentional discrimination against

WHS. Plaintiff admitted that he did not know whether the Environmental Law Council sought or received permission from the Law School administration to use the second bulletin board. (T.T.-1 at 93). Thus, the Plaintiff's own testimony indicates that it is equally likely that the Environmental Law Council simply assumed use of the second bulletin board without permission. (Id. at 57, 93). Plaintiff also offered no evidence that anyone ever took any action to prevent WHS from doing the same thing.

32.     Furthermore, although Ferguson does not recall Plaintiff's request for a second bulletin board, she testified that because bulletin boards were assigned to student organizations by the Student Bar Association ("SBA"), she would have referred the Plaintiff's request to the SBA for handling. (T.T.-1 at 204-5). Accordingly, the lack of a response to the Plaintiff's request was likely the result of SBA inaction, rather than inaction on the part of any member of the Law School administration. Although Plaintiff may instinctively believe that the Law School administration treated WHS differently than the Environmental Law Council on this occasion, there is simply no factual evidence to back up his belief.

### Guest List Requirement for WHS Lecture

33.     Plaintiff also testified that in 1995, WHS attempted to hold a lecture in the Law School open to non-law students. (T.T.-1 at 60). Plaintiff claims that on this occasion, Ferguson told him that he was required to produce a guest list of the non-law students who would attend, in advance of the event. (Id. at 60-61). Plaintiff also introduced into evidence two posters of other events held at the Law School, in 1995 and 1996, by the Black Law Students Association ("BLSA"), which the Plaintiff testified were posted outside of the Law School. (Exs. P-4, P-5; T.T.-1 at 62-3). Thus, according to the Plaintiff, BLSA held its events open to non-law students, which WHS was not permitted to do. (T.T.-1 at 62-3). Plaintiff further

testified that he attended a portion of the 1995 BLSA event, and that he noticed "several hundred" non-law students at the event. (Id. at 82). Plaintiff therefore claimed that his organization was subjected to selective enforcement of the guest list policy.

34.     Again, Plaintiff's own testimony falls short of proving his contention that WHS was subjected to selective use of the guest list policy, as he admitted that he did not raise the issue of the BLSA events with the Law School administration, and he did not know whether BLSA in fact complied with the policy on either of the two occasions when it advertised its lectures by posting flyers at locations outside the Law School. (T.T.-1 at 63-4, 81-2). Accordingly, even if the Plaintiff's testimony is accepted in full, only through sheer speculation could this Court conclude that WHS was unfairly subjected to a guest list policy to which other organizations were not held.

35.     As shown by the testimony of Dean Reinstein, Ferguson, and Assistant Dean Marylouise Esten ("Esten")[3], the guest list policy went into effect at the Law School at a time when the University was experiencing increased security concerns due to thefts. (T.T.-1 at 201-2; T.T.-2 at 87-8). The policy was not created by the Law School administration, but was the result of a University directive emanating from increased security concerns due to a rash of thefts. (T.T.-2 at 87-8). During the time when the guest list policy was in effect[4], whenever the Law School administration became aware that an event inside the Law School was being held

---

[3]     Ferguson was responsible for assisting student organizations with events in 1995; Esten had this responsibility in 1996. (T.T.-1 at 193-4; T.T.-2 at 3).

[4]     The guest list requirement ultimately proved to be unworkable. It was therefore eventually abandoned in favor of a more flexible policy under which an individual or group wishing to hold an event open to non-law students inside the Law School must simply contact the Assistant Dean in charge of student affairs to make appropriate security arrangements in advance of the event. (T.T.-2 at 5, 88).

open to the public, the organization holding the event would be informed of the guest list requirement in the same manner that WHS was informed of this requirement in connection with its event in 1995. (T.T.-1 at 202-3; T.T.-2 at 5-6, 88). Accordingly, neither the enactment of the guest list policy nor the Law School's administration of the policy was targeted at WHS in any way.

36. The testimony of various Law School administrators refutes the notion that the guest list was intentionally selectively enforced against WHS, but not BLSA. Ferguson and Esten, who were responsible for assisting student organizations with events in 1995 and 1996, respectively, testified that they were not aware of the BLSA events being advertised outside the Law School, as neither BLSA, nor WHS, nor anyone else ever raised the issue with the Law School administration at or around the time of the events. (T.T.-1 at 203-4; T.T.-2 at 6-8; see also T.T.-1 at 63-4). Furthermore, both Ferguson and Esten testified that if they had become aware of BLSA's publicity efforts outside the Law School, they would have informed BLSA of the guest list requirement just like Ferguson informed WHS in 1995. (T.T-1 at 203-4; T.T.-2 at 6). In reality, and contrary to the Plaintiff's assumptions, Ferguson did inform other student organizations, including the Environmental Law Council, of this policy when they attempted to hold events in the Law School open to the public. (T.T.-1 at 202-3).

### Student Activities Center Failure to Post WHS Materials

37. In addition to the events involving the Law School administration, Plaintiff also complained about two incidents involving the University's Student Activities Center ("SAC"). In one of these incidents, the Plaintiff claimed that WHS submitted materials to the SAC for posting on certain bulletin boards, which one or more unidentified members of the SAC staff said that they would do. (T.T.-1 at 22, 53). However, according to Plaintiff, WHS

14

later learned that the materials had not been posted. (Id. at 22). Plaintiff admitted that at a meeting held in the wake of this incident, he and Herbert were told that the materials were not posted by their desired time because they were submitted too late. (Id.). Plaintiff further admitted that he had no knowledge of anyone from the SAC being disciplined as a result of this incident. (Id. at 93-4). However, the Plaintiff still referred to this incident, which itself involved nothing more than inaction by low-level student employees (T.T.-2 at 33, 36-7), as an example of the University acting out of bias against WHS.

38. Both Walter Brady ("Brady"), who was Temple's Director of Student Activities at the time of the incidents, and Kristl Wiernicki ("Wiernicki"), who was Temple's Associate Vice President for Student Affairs and Dean of Students at the time of the incidents, testified as to the SAC's policies and procedures, as well as to their dealings with WHS. Although both Wiernicki and Brady received complaints from WHS concerning the actions (or inaction) of the SAC staff on a number of occasions, and investigated such complaints, neither one ever had reason to conclude that WHS was being subjected to a policy of discriminatory treatment due to the views it expressed. (T.T.-2 at 12-14, 16-18, 35-8, 40-41). If either Brady or Wiernicki had ever become aware of any discrimination against WHS by the SAC staff, they would not have permitted it to continue. (Id. at 12, 34).

39. Although both Wiernicki and Brady received complaints from students who were offended by the views expressed in WHS's posters, they never made any attempt to censor WHS in response to such complaints. (T.T.-2 at 15-16, 46-7). Instead, both Wiernicki and Brady responded to such complaints by defending WHS's right to free speech. (Id.). Wiernicki's refusal to censor WHS was consistent with her refusal to censor other organizations whose posters generated similar complaints. (Id. at 47-8).

40.     During the time period in question, the SAC administered a set of policies and procedures governing the posting of written materials at certain locations on Temple's campus.[5] The purpose of this set of policies was to ensure the allocation of scarce space to registered student organizations for their publicity efforts. (T.T.-2 at 31). Under the SAC's posting policy, registered student organizations could submit written materials to the SAC staff for a stamp, which was to serve as a visible indication that the materials could be posted at certain designated locations on Temple's campus for a specified length of time. (Id. at 21, 23-4, 31). In addition to stamping, the SAC staff would also post student organizations' materials at a limited number of locations. (Id. at 11, 32). As a matter of SAC policy, neither the SAC stamp, nor the posting services of the SAC staff, could be refused on the basis of the contents of the materials submitted. (Id. at 18, 32-3).

41.     Materials submitted for posting by the SAC staff were generally posted within a few hours. (T.T.-2 at 42). However, this could not be guaranteed. (Id.). On the occasion of which the Plaintiff complained, WHS's materials were stamped when they were submitted, but were not posted by the end of the same day due to a staffing shortage. (Id. at 37). WHS complained about the SAC's failure to post its materials, and a meeting was held at which WHS's concerns were aired. (Id. at 37-8). However, despite investigating WHS's complaints, neither Brady, nor Wiernicki, nor Law School professor Burton Caine, who attended the meeting at the request of WHS, found any basis for WHS's complaints of unfair treatment by the SAC in connection with this incident. (Id. at 13-14, 16-17, 37-8).

---

[5]     The constitutionality of these policies and procedures is not at issue here.

42. In short, Plaintiff has absolutely no evidence that WHS was subjected to unfair treatment by the SAC in connection with the failure-to-post incident. Like the other incidents referenced by the Plaintiff, this incident does not provide any basis for this Court to find that Temple pursued a policy of discrimination against WHS.

### Student Activities Center Information Desk Incident

43. Plaintiff testified that he was involved in another run-in with the SAC, which occurred when he and Herbert attempted to place WHS materials on a table at the SAC. (T.T.-1 at 53-5). Plaintiff testified that the SAC employee at the table forbid the placement of the WHS materials on the table because the materials did not bear a stamp from the SAC. (Id.). According to the Plaintiff, because other unstamped materials were present on the table, he believes that this incident represents yet another instance of the University implementing its policy of unfair treatment of WHS. (Id.). However, Plaintiff was unable to name the SAC employee involved in this incident, so he was unable to offer anything other than speculation as to whether the individual in question acted out of bias against WHS. (Id.; see also id. at 95-6).

44. Plaintiff also stated that he did not know whether the incident, which also appears to have involved a low-level student employee (T.T.-2 at 44-5), was ever raised with the SAC's management. (T.T.-1 at 55, 106). Plaintiff was unable to produce any evidence that this incident was ever reported to the SAC's management.

45. Wiernicki explained the policies governing the use of the table. As the Plaintiff claims he and Herbert were told on the specific occasion in question, SAC stamping was required for materials to be placed on the table. (T.T.-2 at 39). However, unstamped materials were frequently placed there by students and faculty who did not know that the stamp was required. (Id. at 39-40). Although SAC staff members were instructed to monitor this and other

locations for unstamped materials, unstamped materials could go unnoticed at the table, and elsewhere, due to the heavy traffic at the table and the workload of the SAC staff. (Id. at 39-40). Thus, while SAC's administration of its stamping and posting policies may have been imperfect, there is simply no basis for a finding that the SAC pursued a policy of discrimination against WHS through intentional selective application of these rules.

### Dean Reinstein's Open Letter to the Law School Community

46.    Finally, Plaintiff testified to Dean Reinstein's posting of an Open Letter to the Law School Community (the "Open Letter"). Plaintiff complained bitterly about his "outrage" over the Open Letter, in which Dean Reinstein expressed criticism of WHS. (T.T.-1 at 100-1). Despite reluctantly admitting that Dean Reinstein acted within his First Amendment rights in expressing his view through the posting of the letter (Id. at 91-2), Plaintiff claimed that the University's anti-WHS policy was embodied in the letter, which "set the tone" for WHS's other encounters with Law School and University administration officials. (Id. at 64).

47.    Contrary to the Plaintiff's apparent contention, Dean Reinstein's criticism of WHS in the Open Letter does not amount to the pursuit of a policy of content-based censorship of WHS. This is particularly evident in view of the purpose of the Open Letter, which was written and posted inside the Law School in an attempt to respond to certain law students' demands for disciplinary action against WHS for its placement of inflammatory and offensive posters throughout the Law School. (T.T.-2 at 76-8). Rather than an act of censorship, the Open Letter was intended as an express *refusal* to censor WHS, in that it emphasized that no disciplinary action would be taken against WHS for its expressive activities, despite the fact that Dean Reinstein and others thought that WHS's posters contained hate speech and were

unbecoming of future lawyers. (Id. at 76-8, 101-2; Ex. D-11).[6] In no way can Dean Reinstein's constitutionally protected expression in this regard be construed as an act of censorship.

### No Link Between Other Incidents and Graduation

48.     In an attempt to provide a link between the other incidents listed above and the incidents that occurred at the 1997 and 1998 graduation ceremonies, Plaintiff testified that he assumes that the incidents reflect an overarching University policy of discrimination against WHS and its members, and that he further assumes that this policy was communicated "through the chain of command" to the Campus Police officers with whom he dealt at the graduation ceremonies. (T.T.-1 at 85-6).

49.     Plaintiff's only claimed support for the existence of a chain of command from the Law School to the Campus Police is a single conversation between Bergman and Reinstein prior to a Law School graduation ceremony. (T.T.-1 at 86). Because this conversation occurred in 1999, it can hardly be seen as evidence of the existence of an anti-WHS policy in 1997 and 1998. (Id. at 156). Furthermore, there is no evidence that Reinstein issued any orders or established any policy concerning WHS, Plaintiff, or Herbert during this conversation. On the contrary, it is clear that Herbert's presence at the graduation ceremony was only mentioned incidentally during this conversation, and it is just as clear that Reinstein did not attempt to issue any orders concerning the Campus Police treatment of Herbert on this occasion. (T.T.-1 at 156; T.T.-2 at 89-90).

---

[6]     Reinstein and other University officials have issued similar open letters concerning other organizations and individuals. (T.T.-2 at 79-82, 105-7). Thus, WHS cannot claim that it was treated uniquely in this instance.

50. Plaintiff repeatedly admitted to a lack of any other evidence to support his conjecture concerning the existence of such a policy and the communication of this policy to the Campus Police. (Id. at 76, 84-6, 92, 94-7). Moreover, the Plaintiff's conjecture is not only unsupported, but contradicted by the evidence.

51. As noted above, not one of the incidents of which the Plaintiff has complained represents an instance of intentional discrimination against WHS. Therefore, even when taken together, the incidents cannot be reasonably be seen as reflecting a policy of discrimination against WHS because of its views. In addition, the uncontradicted testimony of the various University and Law School officials has established that the Law School, the SAC, and the Campus Police each have separate chains of command, and that none of these separate administrative divisions has the ability to set policy for the other. (T.T.-1 at 110-1, 144, 205-6; T.T.-2 at 3, 30, 49, 65-6). Thus, Campus Police received neither any general policy nor any specific instructions from the Law School concerning the treatment of Plaintiff and Lincoln Herbert. (T.T.-1 at 116, 124, 153, 155-6). Furthermore, the evidence is clear that at the time of the 1997 and 1998 graduation ceremonies, Bergman and Lowell were unaware of WHS, any controversy surrounding WHS, or the Plaintiff's membership in WHS. (T.T.-1 at 126-7, 152-6). There is simply no evidence whatsoever to back up the Plaintiff's unwarranted and speculative conclusions concerning the existence of an anti-WHS policy that guided the actions of the Campus Police at the graduation ceremonies.

E.    **Temple's Policies and Practices**

**The Open Forum (Free Speech) Policy**

52. Temple's written "Open Forum (Free Speech) Policy," (the "Open Forum Policy") which has been in effect at Temple since 1982, sets forth broad First Amendment

principles governing all expressive activities at Temple. (Ex. D-1; T.T.-2 at 66-8). This policy provides that although the University may not suppress ideas, speech or debate because it considers them offensive, it may regulate the time, place and manner in which its facilities are used, for the convenience of students, faculty and staff. (Ex. D-1). Such time, place and manner restrictions are permitted in recognition of the fact that "[t]here are places in the University which are used for purposes incompatible with their being opened as a public forum." (Id.). The Open Forum Policy further provides that such time, place and manner restrictions "must be applied reasonably and not for the purpose of discriminating against certain persons or groups because of the content of the message they wish to convey." (Id.).

53.    Some of the Campus Police officers who testified at the trial of this matter stated that they were not aware of the Open Forum Policy as of the 1997 and 1998 graduation ceremonies. (T.T.-1 at 157, 170, 182). However, each of the Campus Police officers evinced a knowledge consistent with the general principles embodied in the Open Forum Policy: that they do not engage in content-based censorship, but that reasonable time, place and manner restrictions are imposed on expressive activities conduct on Temple's property. (T.T.-1 at 111, 115, 145-6, 171-3, 182-4).

### Campus Police Practices

54.    Temple's Campus Police have adopted a set of practices with respect to the distribution of written materials on Temple property during graduation and other events at McGonigle Hall and the Liacouras Center (collectively, the "Venues"), that are consistent with the reasonable time, place and manner restrictions permitted under the Open Forum Policy. Neither students nor non-students may distribute written materials or engage in other forms of public protest on Temple property during events at either of the Venues. (T.T.-1 at 113, 145,

170-1, 182). This restriction encompasses both indoor and outdoor Temple property at both Venues, including the outdoor steps and landings comprising the "footprint" of each building. (Id. at 129-30, 145, 170-1, 183). Leafleting and other forms of public protest are permitted on the public sidewalks and streets that run throughout Temple's campus, including the public sidewalks adjacent to both Venues. (T.T. 113, 145, 182).

55.     The restriction on leafleting and other forms of public protest during events at the Venues serves two purposes. First, it preserves the non-public nature of Temple's private property, by reserving such property for the use to which it is dedicated. (T.T.-1 at 138, 146, 164-5, 171). Second, it enables the Campus Police to ensure the free and safe flow of pedestrian traffic through areas which can and do become crowded with pedestrians in the short periods of time just before and after events. (Id. at 117, 134-5, 146, 171).

56.     The Campus Police practice concerning the distribution of written materials on Temple property at the Venues is not set forth in writing. Instead, it is passed along verbally, through on-the-job training. (T.T.-1 at 133, 145, 161, 170, 174, 182).

57.     Because demonstrations and protests occur frequently at the Venues, the Campus Police are familiar with the practice (T.T. 111, 119, 147, 183), and have enforced it not only against the Plaintiff and Herbert, but also against others, such as labor unions, religious groups, and groups concerned with abortion. (T.T. 111, 114-5, 119-20, 136, 147-8, 171-2). In general, the Campus Police seek to enforce the policy by approaching demonstrators, communicating the policy, and suggesting that the expressive activities be conducted on the adjacent public sidewalk, rather than on Temple property. (T.T. 113, 115, 135-6, 148). When a demonstrator or leafleter refuses to cooperate (as did the Plaintiff and Herbert in 1997 and 1998),

the Campus Police order the person off of Temple property and onto the public sidewalk. (T.T.-1 at 122).

58.     The Campus Police do not restrict leafleting and other demonstrations on Temple property at the Venues only when pedestrian traffic is actually being blocked. Instead, in view of the tendency of attendees to arrive for and leave from events all at once, and the resulting fact that the Venues can become very crowded within short periods of time, the Campus Police generally restrict leafleting and other forms of public protest at the Venues even when an actual traffic obstruction has not yet occurred. (T.T.-1 at 168). In this way, the Campus Police not only *prevent* safety hazards and access problems from occurring at all, but they also preserve the non-public nature of Temple's private property. (Id. at 168). This practice also prevents confusion among event attendees who may be misled into believing that a protester is handing out event programs or other materials, and line up to take such materials based on this belief. (Id. at 165).

59.     The Campus Police have some discretion in their treatment of leafleters at the two locations in question, as shown by the fact that Herbert was permitted to distribute leaflets on Temple's outdoor property at the Liacouras Center in 1998. (T.T.-1 at 149-50). This discretion gives the Campus Police the option of permitting a demonstrator or leafleter to continue their expressive activities on Temple property if approaching and removing the individual would cause a greater disruption than the individual's expressive activities are causing. (T.T.-1 at 114, 138, 146, 150, 184). The Campus Police clearly understand that their discretion does not permit them to act, or refrain from acting, based on their agreement or disagreement with the contents of the message a particular demonstrator is attempting to convey. (Id. at 114, 115, 171, 184).

**Application of University Policies and Practices to Plaintiff**

60.     In directing Plaintiff and Herbert to distribute their leaflets on the public sidewalk at the 1997 and 1998 graduation ceremonies, Bergman and Lowell acted in accordance with Temple's policy and practice of prohibiting the distribution of written materials on Temple property at the Venues. (T.T.-1 116, 120, 128-9, 150-1). In enforcing this policy, both Bergman and Lowell were also attempting to preserve Temple's property for the use to which it was dedicated—the graduation ceremonies—on both occasions. (Id. at 116-7, 135, 137, 150-1).

61.     Both Bergman and Lowell testified to a lack of familiarity with WHS, its political views, or Plaintiff's affiliation with WHS as of the 1997 and 1998 graduation ceremonies. (T.T.-1 at 126-7, 152-3). In addition, both testified that they were unaware of any of the other incidents involving WHS and its members (Id. at 126, 153-5), and that they had received no directives from the any Law School or University administration officials concerning the treatment of Plaintiff and Herbert at the graduation ceremonies. (T.T.-1 at 117, 124, 153, 155). Both also denied being motivated by the contents of the leaflets Plaintiff and Herbert distributed on the occasions in question. (Id. 118, 122, 126, 151, 155). Instead, both Bergman and Lowell testified that they acted in accordance with their understanding of University policy, which was that they were entitled to prohibit the distribution of leaflets on Temple property at the Venues, as a reasonable time, place and manner restriction on the use of such property. (Id. at 116-120).

62.     Detective Johnson, whom the Plaintiff claims directed him away from the bottom of the stairs and onto the concrete, or "public" portion of the sidewalk adjacent to McGonigle Hall in 1997, is no longer employed by Temple and did not testify at trial. (T.T.-1 at 140). Plaintiff's testimony that he immediately and unquestioningly complied with this order is

questionable at best, considering his admitted insistence on speaking with supervisory officers, and his arguments with supervisory officers, on other occasions. (T.T.-1 at 30, 32, 40, 46, 116, 112, 150-1). However, even if Plaintiff's testimony in this regard is accepted, it appears that Johnson, who was a subordinate of Bergman and Lowell (T.T.-1 at 110, 143-4), erred when she directed the Plaintiff off of the "private" sidewalk and onto the "public" sidewalk. Instead, the entire sidewalk adjacent to McGonigle Hall is considered public property, which leafleters and protesters may use during events at McGonigle Hall. (Id. at 119, 130-1, 140-1, 164-7). Accordingly, both Bergman (Temple's Chief of Police) and Lowell (Johnson's direct supervisor) stated that they were unaware of the Plaintiff's claimed contact with Detective Johnson, and indicated that her supposed actions were surprising in that they were inconsistent with Temple's policy of restricting access to its private property while allowing leafleting and other forms of public protest on the public sidewalks. (Id).

## II.    Conclusions of Law

### A.    Liability: The Legal Standard

63.    In recognition of the principle that a state actor such as Temple[7], "'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' . . . the [Supreme] Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 800 (1985) (quoting Greer v. Spock, 424 U.S. 828, 836 (1976)).  Under this legal framework, the extent to which access to property can be controlled depends on the nature of the property, or forum, itself.  Cornelius, 473 U.S. at 800.  Where the property in question is a traditional public forum for the free exchange of ideas, such as a public sidewalk, expressive activities can only be restricted by content-neutral time, place and manner restrictions that are narrowly tailored to serve a significant government interest and leave open ample alternative channels for expression. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Auth., 691 F.2d 155, 160 (3d Cir. 1982)[hereinafter ISKCON].  If the property is a non-public forum, restrictions on expressive activities are reviewed only for content-neutrality and reasonableness.  United States v. Kokinda, 497 U.S. 720, 727 (1990).

64.    As this Court has previously held, the Temple property where Plaintiff attempted to distribute his leaflets during the 1997 and 1998 graduation ceremonies is a non-public forum.  (Memorandum and Order dated July 20, 2000, at 5-6).  Temple is therefore

---

[7]    Defendants do not contest Temple's status as a state actor.

entitled to control expressive activities there as it sees fit, so long as the restrictions it imposes are both content-neutral and reasonable. Kokinda, 497 U.S. at 730; United States v. Bjerke, 796 F.2d 643, 648 (3d Cir. 1986).

65. In addition, it is well settled that a state actor such as Temple cannot be held liable under § 1983 on the basis of *respondeat superior*. Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 691 (1978). Instead, Temple may only be held liable for its employees' actions that are taken in accordance with an unconstitutional policy or custom. Monell, 436 U.S. at 690-691. A policy or custom cannot be inferred from a single incident involving an employee in a non-policymaking position. Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Oklahoma City v. Tuttle, 471 U.S. 808, 831 (1985).

66. Plaintiff has the burden of proving that on the occasions in question, the Temple Campus Police acted in accordance with either (1) a policy or custom of content-based censorship, or (2) an unreasonable policy or custom restricting the time, place and manner of expressive activities on Temple's property. See Cuesta v. School Bd. of Miami-Dade County, Fla., 285 F.3d 962, 966 (11th Cir. 2002) (setting forth plaintiff's burden of proof under 42 U.S.C. § 1983); Birdsall v. City of Hartford, 249 F.Supp. 2d 163, 169 (D. Conn. 2003) (same); Roman v. Appleby, 558 F.Supp. 449 (E.D. Pa. 1983) (same). Plaintiff has not met this burden in either respect.

**B. The Campus Police Actions Were Not Content-Based**

67. Plaintiff claims that the Temple Campus Police acted in accordance with a University policy of unfair treatment of WHS and its members when they restricted him to distributing leaflets on the public sidewalk on the two occasions in question. This claim is not supported by any direct evidence, in the form of the actual policy which the Plaintiff claims

27

existed, or an admission on the part of the Campus Police that they acted in accordance with such a policy. In fact, both the University's written Open Forum Policy, and the established practice of the Campus Police, are expressly content-neutral. Nor is the Plaintiff's claim of content-based discrimination supported by sufficient circumstantial evidence from which this Court could draw a reasonable inference of such unfair treatment, in the form of testimony to the effect that the Campus Police allowed other leafleters or demonstrators to engage in expressive activities on Temple property during events at the Venues. See Lickteig v. Landauer, 1992 WL 164704, *9 (E.D. Pa. 1992). Plaintiff presented no such evidence to indicate that anyone else was allowed to do what he and Herbert were not allowed to do.

68.     Plaintiff's claim of content-based discrimination rests entirely on two supposed bases: (1) his own testimony that certain Campus Police officials briefly looked at the leaflets before directing him to the public sidewalk, and (2) his testimony concerning instances in which he believes WHS was subjected to similar content-based censorship in the past. However, neither of these purported bases provides sufficient evidence for this Court to draw a reasonable inference that the Campus Police acted in accordance with an unconstitutional policy or custom of discriminating against WHS and its members at either graduation ceremony. Instead, the Plaintiff's testimony amounts to nothing more than groundless speculation, apparently emanating from Plaintiff's instinctive belief that Temple's liberal students and faculty were predisposed against WHS's conservative views. (T.T.-1 at 15-16).

69.     Plaintiff claims that various members of the Campus Police, including Lowell and Bergman, looked at his leaflets before directing him to the public sidewalk. This claim, along with most of the rest of the Plaintiff's versions of both incidents, is contradicted by the testimony of Lowell and Bergman, both of whom deny having looked at Plaintiff's leaflets

before directing him to the sidewalk. (T.T.-1 at 117, 122, 151). This Court need not resolve this factual dispute, for even if the Plaintiff's testimony concerning the actions of the Campus Police is accepted in full, only a blind leap of faith could lead from this evidence to a conclusion that the police were motivated by the contents of the leaflets. Plaintiff presented no evidence that any of the Campus Police officers with whom he dealt (many of whom Plaintiff could not identify) actually disagreed with the contents of his leaflets, or that they acted on the basis of such disagreement. To the extent that any Campus Police officers may have looked at the Plaintiff's leaflets before directing him to go to the sidewalk, it is just as likely that they did so in order to verify that the leaflets were not graduation programs, or out of mere interest, neither of which raises any constitutional concern. Cf. Hill v. Colorado, 530 U.S. 703, 719-723. (2000) (merely discerning the speaker's purpose in order to determine whether a rule applies does not constitute impermissible content- or viewpoint-based discrimination).

70.     In the absence of rank speculation, the Plaintiff's testimony that the police looked at his leaflets before acting cannot support a conclusion that the Plaintiff was subjected to invidious discrimination on either of the occasions in question. Furthermore, the actual evidence presented at trial contradicts the Plaintiff's conjecture as to the motivations of the Campus Police. Bergman and Lowell, the two supervisory officers whose orders the Plaintiff ultimately obeyed in moving to the public sidewalk, denied being motivated by the contents of the Plaintiff's leaflets. These denials are bolstered by the Campus Police testimony that public protests occur at Temple on a frequent basis, and the Plaintiff and Herbert, who were undoubtedly neither the first nor the only demonstrators at Temple to express criticism of the University, were treated the same as (or given greater latitude than) others who have tried to engage in expressive activities at the Venues. Accordingly, Plaintiff's testimony concerning the

supposed actions of the Campus Police in looking at his leaflets fails to provide any basis for his claim of content-based discrimination.

71.     The other incidents to which the Plaintiff has referred also fail to support his claim that the Campus Police acted in accordance with a policy of content-based discrimination at the 1997 and 1998 graduation ceremonies. Of the seven incidents raised by the Plaintiff, only one, Dean Reinstein's Open Letter to the Law School Community, provides any indication that any administration officials at Temple actually disliked WHS. Plaintiff's outrage over Dean Reinstein's expression of views with which he disagrees is incongruous given his would-be status as a champion of the First Amendment rights of those with unpopular views. Despite its pointed criticism of WHS, the Open Letter itself constitutes protected speech under the First Amendment, and cannot reasonably be seen as reflecting a policy of discrimination against WHS or its members.

72.     WHS was neither intentionally targeted, nor was it singled out for differential treatment, in any of the other six incidents of which the Plaintiff has complained, so these also provide no basis for the Plaintiff's claim of a conspiracy to censor WHS. Plaintiff has failed to produce any evidence that even one of the incidents of which he complained represented an actual instance of content-based suppression of WHS's expressive activities. To the extent that certain actions of Law School administrators and Student Activities Center employees impacted upon WHS's expression of its views, this appears to be the result of mere happenstance, rather than a conspiracy to squelch WHS.

73.     In addition to an utter lack of evidence of any attempts by Temple officials to suppress WHS's expressive activities, there is also a complete lack of any evidence of a connection among the various incidents, or between the incidents and the actions of the Campus

Police at the 1997 and 1998 graduation ceremonies. Plaintiff's speculation that the incidents are tied together with a "policy" is without a shred of evidentiary support, as is his contention that Law School administrative officials transmitted such a policy through their chain of command to both the Student Activities Center and the Campus Police. In fact, the testimony of the various witnesses at trial expressly refutes this contention, by showing a lack of communication among the Law School administration, the Student Activities Center, and the Campus Police. Contrary to the Plaintiff's suspicion, the evidence has shown that the Campus Police did not fall within the "chain of command" of either the Law School or the Student Activities Center, and neither the Law School nor the Student Activities Center ever attempted to set policy for, or give orders to, the Campus Police concerning Plaintiff, Herbert, or anyone else.

74. Plaintiff presented no evidence to show that either (1) any of the incidents involving the Law School and the SAC, or (2) any general animosity on the part of Law School or University officials toward WHS was ever communicated to the Campus Police by the time of the 1997 and 1998 graduation ceremonies. Nor did Plaintiff present any evidence to prove that the Campus Police acted out of bias toward him as a member of WHS on either occasion. The sheer volume of Plaintiff's complaints alone cannot support a claim of content-based discrimination, particularly in the absence of any evidence of intentional non-enforcement of the same policies against similarly situated groups or individuals. Lickteig, 1992 WL 164704 at *9. Instead of proving discrimination against WHS, all Plaintiff has proven is WHS's propensity to complain.

75. This Court cannot render a verdict based on mere speculation. Northwestern Pac. R. Co. v. Bobo, 290 U.S. 499, 503 (1934); Eastern Associated Coal Corp. v. Aetna Cas. & Surety Co., 632 F.2d 1068, 1074 (3d Cir. 1980), cert. denied, 451 U.S. 986 (1981).

Plaintiff's claim of content-based discrimination, which is supported by nothing other than the Plaintiff's own baseless conjecture and apparent lingering resentment over a handful of unrelated events that he claims occurred years ago, must therefore fail.

**C.** **The Campus Police Imposed Reasonable Time, Place and Manner Restrictions**

76. The evidence in this case has established that rather than acting out of bias toward WHS, the Campus Police acted in accordance with their understanding of the principles behind Temple's Open Forum Policy, as well as in accordance with their established practice of restricting leafleting and other forms of public protest to the public sidewalks, rather than Temple property. Having failed to prove a policy of content-based discrimination, Plaintiff must prove that the Campus Police policy and practice in this regard is unreasonable. Kokinda, 497 U.S. at 730. Plaintiff has not carried his burden in this respect, either.

77. The restrictions placed on the Plaintiff's activities as a result of Temple's policy and practice concerning the use of its facilities need only be reasonable, not perfect. Kokinda, 497 U.S. at 730. Temple is not required to grant free access to all of its grounds and buildings for expressive purpose. Perry Education Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 44 (1982); Widmar v. Vincent, 454 U.S. 263, 268 n. 5 (1981). Instead, it retains the right to enforce reasonable restrictions on the use of its property to prevent interference with its normal use. Sword v. Fox, 446 F.2d 1091, 1096-7 (4th Cir. 1971), cert. denied, 404 U.S. 994 (1971).

78. In testing for reasonableness, this Court is not to be concerned with whether Temple's rules are wise or expedient, id., nor may the Court hold Temple to a standard of imposing only the most reasonable of restrictions. Kokinda, 497 U.S. at 735 (quoting

Cornelius, 473 U.S. at 808). Even if more narrowly tailored regulations are possible, Temple's regulations must still be upheld if they are reasonably calculated to prevent interference with the normal activities of the forum. Kokinda, 497 U.S. at 735-6; Sword, 446 F.2d at 1098. The restrictions placed on the Plaintiff during the 1997 and 1998 graduation ceremonies fall well within these bounds.

79.     The reasonableness of a restriction on the use of property is generally a matter of common sense. See Kokinda, 497 U.S. at 734-5. "[A]n important factor in determining the reasonableness of a restriction on First Amendment rights is whether the proposed activity is basically incompatible with the normal character and functions of the place." ISKCON, 691 F.2d at 161 (citing Heffron v. ISKCON, 452 U.S. 640, 650-651 (1981); Grayned v. City of Rockford, 408 U.S. 104, 115-6 (1972)). When the property in question is a non-public forum, "the government may--without further justification--restrict use to those who participate in the forum's official business." Perry, 460 U.S. at 53 (emphasis added).

80.     Judged by this standard, the Campus Police policy and practice concerning the treatment of leafleters at the Venues is reasonable. On each of the occasions in question, the official business of the forum was a graduation ceremony. Rather than attending the graduation ceremonies, Plaintiff instead wished to protest by distributing unrelated written materials at the ceremonies. As a matter of common sense, Temple cannot be compelled to permit two competing uses of the same property to take place at the same time, nor can Temple be forced to allow the Plaintiff or any other demonstrator to create the misleading impression that he was distributing graduation programs when in fact he was distributing materials protesting the event. By directing the Plaintiff to the public sidewalk to distribute his leaflets, the Campus Police were merely restricting the use of Temple's property to its official business, and their actions were

therefore reasonable *per se*, without the need for any further justification. A contrary holding would yield the untenable result of imposing §1983 liability on Temple for attempting to preserve portions of its property as non-public forums.

81.  Although no further justification is needed here, one exists. Courts have consistently held that regulations aimed at protecting safety and property, maintaining normal operations, limiting congestion and disruption, and facilitating pedestrian traffic and crowd control are reasonable. See Families Achieving Independence and Respect v. Nebraska Dept. of Social Services, 111 F.3d 1408, 1421 (8th Cir. 1997) [hereinafter FAIR]; Sword, 446 F.2d at 1096; ISKCON, 691 F.2d at 162. The availability of nearby alternative areas for communication enhances the reasonableness of a regulation. Bjerke, 796 F.2d at 650.

82.  The restrictions imposed on the Plaintiff's activities during the 1997 and 1998 graduation ceremonies are also reasonable under this standard, as they were sufficiently geared toward the valid public safety purpose of easing the flow of pedestrian traffic through a crowded area. Plaintiff has placed heavy emphasis on his own belief that because he and Herbert were the only leafleters at the two ceremonies, they did not block access to the building and their removal was not strictly necessary. However, the reasonableness of the actions of the Campus Police "should not be measured by the disorder that would result from granting an exemption solely to [Plaintiff]," particularly since if Plaintiff is permitted to carry on his expressive activities at the Venues during graduation ceremonies, so too must other groups be permitted to engage in such activities during other events there. International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 685 (1992). As long as the restriction is reasonably aimed at preventing the disruption of activities at the location in question, "the government need not wait until havoc is wreaked to restrict access." Bjerke, 796 F.2d at 650; see also Student

<u>Coalition for Peace v. Lower Merion School District Bd. Of School Directors</u>, 776 F.2d 431, 437 (3d Cir. 1985).

      83.    Temple's practice of prohibiting the distribution of written materials at graduation and similar events, other than those written materials which were prepared and distributed as part of the event itself, is reasonably connected with preventing anticipated interference with graduation and other events at the Venues. Due to the nature of the events held at the Venues, the areas inside and just outside both buildings become heavily congested with pedestrian traffic for the short periods of time both before and after events. A policy of allowing some small-scale demonstrations to take place as long as access is not significantly impeded during such events would clearly pose a risk of incidents of access being blocked or impeded during the short periods of time when crowds arrive and depart, and would also pose a risk of conflicts among different individuals or groups seeking to demonstrate at the same place and time. Plaintiff may not think that Temple's policy and practice of prohibiting all expressive activities during events at the Venues is perfectly suited to his specific circumstances, but it is sufficiently reasonable to pass muster under First Amendment standards for non-public forums. <u>Sword</u>, 446 F.2d at 1098; <u>see also</u> <u>ISKCON v. Lee</u>, 505 U.S. at 685. Because the conduct of protests and other expressive activities on Temple's property at the Venues is basically incompatible with the use of the Venues for the graduation ceremonies and other events, the actions of the Campus Police in directing the Plaintiff to the public sidewalk were reasonable.[8]

---

[8]    Plaintiff's claim that Officer Johnson not only ordered him off Temple property, but onto the outer, concrete portion of the sidewalk adjacent to McGonigle Hall is irrelevant. As Plaintiff admits, it is clear that even if Officer Johnson did order him onto a different portion of the sidewalk, she did so in error, rather than in accordance with Temple's policy and practice of permitting leafleting and other forms of public protest on the entire public sidewalk. Temple cannot be held liable under 42 U.S.C. § 1983 on the basis of

(continued...)

84. The discretion of the Campus Police, which allowed them to attempt to avoid a confrontation by giving Herbert some latitude that has not been granted to other similarly situated individuals, does not render their actions, or their policy and practice, unreasonable. As a practical matter, police must always exercise some discretion in deciding what to do in any particular situation. Com. v. Stipetich, 539 Pa. 428, 430, 652 A.2d 1294, 1295 (1995), and the exercise of some discretion by the Campus Police in their treatment of Plaintiff and Herbert is irrelevant, as their decisions were not based on an unconstitutional standard. Stemler v. City of Florence, 126 F.3d 856, 873 (6th Cir. 1997), cert. denied, 523 U.S. 1118 (1998); United States v. Yingling, 368 F. Supp. 379, 382-3 (W.D. Pa. 1973). Plaintiff cannot use the Constitution to demand preferential treatment to which he is not entitled. Diesel v. Town of Lewisboro, 232 F.3d 92, 104 (2d Cir. 2000).

85. Underscoring the reasonableness of the Campus Police practice of prohibiting leafleting and other demonstrations on Temple property at the two Venues, is the fact that such activities are permitted on the public sidewalks surrounding the Venues. Demonstrators such as the Plaintiff are thus allowed a reasonable alternative means of access to their intended audience in a location where they are less apt to block traffic or confuse people into thinking that they are distributing event programs.

86. Even if, as the Plaintiff has complained, it was not as easy for him to reach his entire intended audience as he distributed leaflets alone on the sidewalk, this does not render the actions of the Campus Police unreasonable since "[t]he First Amendment does not demand

---

(...continued)

this single error, particularly since there is no evidence that Johnson was in a policymaking position. Monell, supra.

unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." Cornelius, 473 U.S. at 809 (citing United States Postal Service v. Council of Greenburgh Civil Assns., 453 U.S. 114, 129 (1981)). Temple cannot be said to have acted unreasonably merely because they failed to allow a single person to stand where he could be guaranteed to give a leaflet to each and every person attending the graduation ceremonies. This is just as true for 1997, when the Plaintiff claims that he was directed off the brick sidewalk and onto the nearby concrete sidewalk, as it was in 1998, when he was permitted to stand directly at the bottom of the steps to the Liacouras Center, as there is no indication that the Plaintiff was deprived of reasonable access to his desired audience on either occasion.

87.     Various courts have upheld regulations on the use of property similar to those enforced by Temple at its 1997 and 1998 graduation ceremonies. For example, in Storti v. SEPTA, 1999 WL 729266 (E.D. Pa. 1999), aff'd., 265 F.3d 1056 (2001), cert. denied, 534 U.S. 1132 (2002), this Court upheld a policy prohibiting the distribution of written materials in the paid areas and platforms of SEPTA train stations. Similarly, in ISKCON v. New Jersey Sports and Exposition Authority, supra, the Third Circuit Court of Appeals sustained a similar policy prohibiting both commercial solicitation and the free distribution of written materials within the Meadowlands Sports Complex. In Sword v. Fox, supra, a policy prohibiting all demonstrations inside buildings on a college campus was upheld by the Fourth Circuit. Finally, in Lickteig v. Laudauer, supra, Judge Hutton of this Court sustained the imposition of restrictions on leafleting and other expressive activities on South Street in Philadelphia. In each of these cases, the courts explained their decisions in terms of preventing disruption of the normal activities at the property in question. ISKCON, 691 F.2d at 161-2; Sword, 446 F.2d at 1097-8; Storti, 1999 WL 729266

at *8; Lickteig, 1992 WL 164704 at *9. In ISKCON, Storti, and Lickteig the desire to maintain the free flow of pedestrian traffic in crowded areas was specifically cited as one of the reasons justifying the prohibition on distribution of written materials. ISKCON at 162; Storti at *8; Lickteig, at *9. In Lickteig, this justification was held sufficient under the strict scrutiny standard for public forums, even when the police acted in order to *prevent* a safety or traffic hazard, rather than to address an existing impediment to pedestrian traffic. Lickteig at *2, 3.

88.     In insisting upon being permitted to intrude upon campus events such as graduation by distributing unrelated written materials on Temple's private property, Plaintiff apparently assumes that he has the right to publicize his views whenever and wherever he pleases. This position has been rejected time and again. See e.g., Adderley v. State of Florida, 385 U.S. 39, 47-48 (1966) (citing Cox v. State of Louisiana, 379 U.S. 536 (1965)); ISKCON, 691 F.2d at 159. Temple's policy and practice concerning the use of its property during campus events is both content-neutral and reasonable in light of the purposes served by the property on which Plaintiff has sought to distribute his leaflets. The Plaintiff's First Amendment claims must therefore fail.

### D.     Submitted In the Alternative:  Plaintiff Has Sustained No Actual Damages

89.     "[D]amages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in cases brought under 42 U.S.C. § 1983. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 310 (1986); Bacon v. Bradley-Bourbonnais High School District No. 307, 707 F. Supp. 1005, 1010 (C.D. Ill. 1989). Having established no actual injury as a result of either incident, and lacking any evidence of the type of conduct that would justify an award of punitive damages, see Smith v. Wade, 461 U.S. 30, 56 (1983) (punitive damages may only be awarded when the defendant's conduct is

"motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"), Plaintiff can recover no more than nominal damages in any event. <u>Bacon</u>, 707 F. Supp. at 1010.

Respectfully submitted,

Dated: July 16, 2004

Carrie E. Watt
BALLARD SPAHR ANDREWS &
   INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
215-665-8500

Counsel for Defendants, Temple University
and the James E. Beasley School of Law

## CERTIFICATE OF SERVICE

I hereby certify that on this date, July 16, 2004, I caused a true and correct copy of the foregoing Defendants' Proposed Findings of Fact and Conclusions of Law to be served by Federal Express and first class mail on the following:

> Glenn Brown, Esq.
> 104 South York Road
> Hatboro, PA  19040

Carrie E. Watt, Esq.