IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DONALD S. SABATINI                          :
                                            :          CIVIL ACTION
              v.                            :
                                            :          NO. 99-2393
ROBERT REINSTEIN, ET AL.                    :


**MEMORANDUM**

**SURRICK, J.**                                      **OCTOBER __7__, 2016**

   Plaintiff Donald S. Sabatini has filed several complaints asserting claims pursuant to 42

U.S.C. § 1983 and the Pennsylvania Constitution against Defendants Robert J. Reinstein, as the

Dean of the James E. Beasley School of Law ("Reinstein"); the James E. Beasley School of Law

of Temple University ("Law School"); and Temple University ("Temple" or "University").  (ECF

Nos. 1, 4, 10.)[1]  Plaintiff alleges that the Campus Police Department ("CPD") prevented him

from distributing leaflets during the Law School graduation ceremonies because the leaflets were

critical of Reinstein and the Law School.[2]  While Plaintiff initially sought to pursue various state

---

[1]  At all times relevant hereto, Robert Reinstein was the Dean of the Law School.  He is no longer
dean and is presently a professor at the Law School.

[2]  The proper vehicle for a First Amendment claim is 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983 (2000); *see, e.g.*, *Healy v. James*, 408 U.S. 169, 180 (1972) ("[W]e note that
state colleges and universities are not enclaves immune from the sweep of the First
Amendment.").  The parties stipulated that the Law School and Temple University are state

and federal constitutional theories against Defendants related to the 1997, 1998, 1999 and 2000 graduation ceremonies, only his First Amendment claims against the Law School and Temple University regarding the 1997 and 1998 commencement exercises survived Defendants' motions for summary judgment.[3]

A bench trial was held to determine whether Defendants violated Plaintiff's First Amendment rights during the 1997 and 1998 Law School graduation ceremonies. Based upon the credible evidence and testimony presented during the trial, we make the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

### A.   Background

1. Plaintiff enrolled as an evening student at the Law School in the fall of 1992 and became a full-time student in the fall of 1993. (Tr. 6/29/04 at 15.)

2. While a student at the Law School, Plaintiff was a member of the Western Heritage Society ("WHS"), a "politically conservative group." (*Id.*)

3. Lincoln Herbert was a founding member of WHS and was president of the organization until he was suspended in 1994. (*Id.* at 23.)

4. Plaintiff served as vice president and president of WHS. (*Id.* at 20.)

5. The University had an *Open Forum (Free Speech) Policy* that addresses the speech rights of individuals on its property. "The purpose of this policy is to restate fundamental First Amendment principles, which is the way the University has operated historically." (Tr. Ex. D-1.) Under the terms of the policy,

   [T]he University may not suppress ideas, speech or debate because it

---

actors.

[3]  The case was initially assigned to the Honorable Edmund V. Ludwig.

considers them offensive.  It may, of course, regulate conduct associated with speech to insure [sic] that violence or other illegal acts do not occur.  In an extreme situation, speech can itself be prohibited if it is evident that there would be a clear and present danger of violence or other illegal act.  The University may also regulate the time, place and manner that its facilities are used, for the convenience of students, faculty, and staff.  There are places in the University which are used for purposes incompatible with their being opened as a "public forum."  Time, place and manner restrictions must be applied reasonably and not for the purpose of discriminating against certain persons or groups becuase [sic] of the content of the message they wish to convey.

(*Id.*)

**B.     CPD Enforcement of the *Open Forum (Free Speech) Policy***

6.      The CPD is not under the authority of Reinstein or the Law School.  (Tr. 6/29/04 at 110, 206.)

7.      The CPD was required to comply with the University's *Open Forum (Free Speech) Policy* regarding speech activities on University property.  (*Id.* at 111, 113-14.)

8.      According to Robert Lowell, head of the CPD Investigations Unit, the University policy regarding free speech rights is "that we cannot discriminate, that we have to allow people to express their opinions but we also have to take and can take into consideration time, place and manner."  (*Id.* at 111.)

9.      While the CPD retains discretion regarding time, place, and manner restrictions, officers may not restrict a person's ability to distribute information based on the content of that information.  (*Id.* at 114.)

10.     Lowell "wanted to make sure that everyone is treated consistently . . . ."  (*Id.* at 117.)

11.     No specific written policy was given to the CPD officers that instructed them about how to deal with individuals seeking to express their First Amendment rights on University property.  (*Id.* at 162-63.)

12.     The *Open Forum (Free Speech) Policy* was not given to William Bergman, former Managing Director for Public Safety.  Rather, he was told about the policy.  (*Id.* at 161.)

13. Denise Wilhelm, a CPD officer who supervises approximately eighty (80) officers, did not receive a written copy of the *Open Forum (Free Speech) Policy*.  (*Id.* at 169, 179-80.)

14. Allen Hulmes, who was a CPD detective, was unaware of a written policy regarding freedom of expression on University property.  He applied a policy based on past practice.  (*Id.* at 182, 186.)

15. According to Lowell, "the policy is a very wide policy, it doesn't describe in particularity anything other than university facilities."  He interpreted the term "facilities" to include the steps and veranda of a University building.  (*Id.* at 129-30.)  According to Lowell, protests are protected on walkways that are fully on University property, or at least that the CPD has "allowed groups to demonstrate on those public areas or on those university walkways, but not on the steps or verandas of any of the buildings that are adjacent to them."  (*Id.* at 132.)

16. Bergman believed that "[t]he policy was that protestors or leafletters were permitted to do whatever they wanted on the city streets and pavements. And that, in fact, if they wanted to come in the building or on a [University] property, they would have to receive prior permission."  (*Id.* at 145.)

17. During Temple's commencement exercises in 1997 and 1998, different ceremonies were held successively.  Several thousand people could be leaving a graduation ceremony while several thousand other people were preparing to attend the next one.  (*Id.* at 117.)

18. The CPD generally does not allow anybody to distribute written materials on University property during graduation events that are not related to the commencement exercises themselves.  (*Id.* at 27, 113.)

19. The University's general policy against allowing individuals to distribute materials at Temple events, such as graduation, is intended to ensure that those attending the events can enter and exit the buildings safely, and without incident.  (*Id.* at 117, 146, 171.)

20. Lowell and Bergman were not aware of anyone being permitted to distribute materials during graduation ceremonies at McGonigle Hall or the Apollo building that were not related to the graduation.  (*Id.* at 125, 152.)

C.     **Plaintiff's Leafleting at 1997 Law School Graduation Ceremony**

21.     Plaintiff attended the 1997 Law School graduation ceremony with the intention of distributing leaflets.  (*Id.* at 24.)

22.     These leaflets were photocopied newspaper articles that were critical of Reinstein and the Law School.  (*Id.* at 24-25.)

23.     Plaintiff began distributing the leaflets inside of McGonigle Hall in the outer lobby area.  (*Id.* at 26-27.)

24.     When Plaintiff began to distribute leaflets in McGonigle Hall, one graduation ceremony that involved several thousand people was ending and another ceremony that involved another group of several thousand people was going to begin.  (*Id.* at 117.)

25.     Plaintiff positioned himself roughly in the middle of the outer lobby area to distribute the leaflets.  (*Id.* at 27-28.)

26.     Two CPD officers approached Plaintiff about ten (10) minutes after he began to distribute leaflets and asked to see the flier.  (*Id.* at 29.)

27.     After reviewing the leaflet, the CPD officers informed Plaintiff that he could not distribute the leaflets in the outer lobby.  (*Id.* at 71.)

28.     Plaintiff asked to speak to a CPD supervisor.  (*Id.* at 30.)

29.     Lowell arrived and asked to speak to Plaintiff outside of McGonigle Hall. (*Id.* at 31, 109.)  He did not look at Plaintiff's leaflets before asking him to leave the building.  (*Id.* at 117.)

30.     Lowell told Plaintiff that he was not allowed to distribute the material at McGonigle Hall and requested that he move to the public sidewalk that led to the steps of the building.  (*Id.* at 32, 116.)

31.     Plaintiff described his position on the public sidewalk as an ineffective position to distribute the leaflets.  (*Id.* at 36-38.)

32.     After a few more minutes, Plaintiff went into McGonigle Hall to attend the graduation ceremony.  (*Id.* at 38-39.)

33.     On the way into the hall, Lowell again instructed Plaintiff not to distribute the material inside.  (*Id.* at 39-40.)

34. According to Lowell, this situation was handled in the same manner as the many other similar situations that arise frequently. (*Id.* at 119-20.)

35. Lowell was unaware of any of the incidents that Plaintiff cites as evidence of a pattern of discrimination at the Law School and he was only vaguely aware of WHS. (*Id.* at 126-27.)

**D.    Plaintiff's Leafleting at 1998 Law School Graduation Ceremony**

36. Plaintiff and Lincoln Herbert arrived at the Law School's 1998 graduation ceremony at the Apollo building (currently the Liacouras Center) to distribute leaflets that were critical of Reinstein and the Law School. (*Id.* at 41-43.)

37. Plaintiff distributed materials in the outer lobby of the Apollo building. (*Id.* at 43.)

38. After Plaintiff distributed leaflets for several minutes, two CPD officers approached him and requested a leaflet. (*Id.* at 43-44.)

39. After Plaintiff gave a leaflet to each officer, they walked away. (*Id.* at 44.)

40. The officers provided the materials to another member of the CPD. (*Id.* at 45.)

41. Lowell and Bergman observed Herbert distributing leaflets on the steps of the Apollo building and allowed him to continue to distribute his materials. (*Id.* at 120-21, 128, 149-50.) After Herbert went inside the Apollo building to join Plaintiff in the outer lobby, Lowell told him that he could not distribute anything inside the building. (*Id.* at 121.) Lowell did not look at the leaflets before asking Herbert to leave the Apollo building. (*Id.* at 122.)

42. Bergman also told Herbert and Plaintiff that they could not distribute anything inside the building. (*Id.* at 150-51.) He did not look at the leaflets before asking Herbert and Plaintiff to leave the Apollo building. (*Id.* at 151.)

43. Plaintiff moved to the public sidewalk to distribute the leaflets. However, he felt that he could not effectively distribute his materials at that location. (*Id.* at 49-51.)

44.     Bergman was not familiar with WHS and was unaware of any of the incidents that Plaintiff cites as evidence of a pattern of discrimination at the Law School.  (*Id.* at 151-54.)

**E.     Asserted Pattern of Discrimination Against Plaintiff and WHS**

45.     In order to post fliers in areas outside the Law School, such as kiosks, bulletin boards, and other University buildings, the material needed to be stamped by the Student Activities Center ("SAC").  (*Id.* at 22; Tr. 6/30/04 at 10.)

46.     The granting of the stamp that was required to post information did not depend on the content of the document.  (Tr. 6/30/04 at 18-19, 32-33.)

47.     While Temple employees post approved posters in the Law School, the student organization is responsible for placing posters at other approved sites throughout the University campus.  (*Id.* at 27.)

48.     The SAC was not under Reinstein's supervision.  (*Id.* at 65-66.)

49.     Plaintiff alleges that the SAC failed to post information about a WHS event because the posters were submitted too late.  (Tr. 6/29/04 at 22.) According to Kristl Wiernicki, former Associate Vice President for Student Affairs and Dean of Students, WHS submitted four posters early in the afternoon.  By 5:00 p.m., the SAC had stamped them but had not posted them because of a lack of student staff members.  (Tr. 6/30/04 at 37.)

50.     After the alleged failure to post certain WHS materials, a meeting was held to address WHS's concerns.  The complaints of WHS were deemed to be meritless.  (*Id.* at 10, 12-13.)

51.     WHS attempted to place fliers on a table in the SAC that were not stamped.  A Temple employee who sat at the table informed Plaintiff that he would not be allowed to place his materials on the table because they were not stamped by the SAC.  (Tr. 6/29/04 at 53-54.)

52.     While the Law School had a policy of not allowing documents without a stamp to be placed on the table, unstamped material often would be placed on the table without proper SAC approval.  (Tr. 6/30/04 at 40.)

53.     Plaintiff made no formal complaint to the Law School or University administration and kept no record of this incident.  (Tr. 6/29/04 at 95-96.)

54.  Some student organizations at the Law School, including WHS, had a designated bulletin board that they could use to post information.  (*Id.* at 56.)

55.  The Environmental Law Council used a bulletin board that was larger than that used by WHS.  Plaintiff sent two letters to Adelaide Ferguson, former Assistant Dean for Student Affairs and Assistant Dean for Graduate and International Programs, requesting similar additional bulletin board space, but received no response.  (*Id.* at 56, 193; Tr. Ex. P-3.)

56.  Plaintiff did not know whether the Environmental Law Council obtained permission to use additional bulletin board space.  (Tr. 6/29/04 at 93.)

57.  Various student groups placed easels near the entrance to the Law School on which they placed materials related to their organization.  (*Id.* at 56.)

58.  Plaintiff constructed an easel for WHS and placed it with the other easels at the Law School entrance.  At some point, the Law School removed all easels from that area. (*Id.* at 56, 200.)

59.  Assistant Dean Ferguson determined that the easels became a fire hazard and began to interfere with the flow of people into and out of the building. (*Id.* at 198-99.)

60.  Plaintiff did not complain to the University or Law School about the removal of the easels.  (*Id.* at 106.)

61.  Plaintiff attempted to reserve a room for a WHS guest lecture.  The administration informed him that there was a fee that was "close to a thousand dollars" to rearrange an available room and then to convert it back to its normal use.  (*Id.* at 58-59.)

62.  Deborah Feldman, Assistant Dean for External Affairs, remembered the fee as being $500.  (Tr. 6/30/04 at 49, 58.)

63.  According to Dorothy Lee, Director of Special Events, when WHS requested space for a lecture, the only room available for the requested time was the faculty lounge.  (Tr. 6/29/04 at 223.)

64.  The University's Facilities Management department, which is unionized, is responsible for rearranging rooms for specific events.  Student groups are charged for the necessary union labor if a room, such as the faculty

lounge, needs to be rearranged for an event, such as a lecture.  (*Id.* at 223-24; Tr. 6/30/04 at 53.)

65.   The purpose of the fee was not to discourage WHS from having a lecture. (Tr. 6/29/04 at 224.)

66.   Plaintiff did not know whether the Law School charged a fee to other groups that wanted to use that same space.  (*Id.* at 104.)

67.   The University had a policy that required groups to provide a list of individuals from outside the Law School community who would be attending any event.  The creation of a guest list was intended to assist the Law School in maintaining building security.  (*Id.* at 201-02, 218; Tr. 6/30/04 at 4, 87-88.)

68.   WHS was bringing a speaker to the Law School and wanted to invite the entire University community.  However, the Law School administration informed WHS that non-law students could only attend if they were on a guest list.  (Tr. 6/29/04 at 60.)

69.   Plaintiff did not know whether other student groups, such as the Black Law Students Association, submitted a guest list to the Law School for lectures that were open to the University community at large.  (*Id.* at 61-62, 81.)

70.   Plaintiff did not raise his concerns about the guest list policy to anybody within the University or Law School administration.  (*Id.* at 64.)

**F.   Reinstein's Protection of WHS's First Amendment Rights**

71.   Reinstein believed that "there has to be a maximum amount of freedom of expression at universities, that's what universities are all about, and [he] thought that the existence and implementation of speech codes at universities were terrible things and were contrary to what universities stood for or should stand for."  (Tr. 6/30/04 at 70.)

72.   Reinstein has a history of defending controversial speech, such as allowing a student group to bring Louis Farrakhan to speak at the University.  (*Id.* at 69-70, 80.)

73.   Reinstein supported WHS's petition to be recognized as a student organization by the Student Bar Association ("SBA").  If the group satisfied the minimal criteria for recognition, he threatened to overturn any

decision by the SBA to deny recognition to it.  (*Id.* at 74-75.)

74.   Reinstein received complaints from WHS that students were tearing down its posters.  In response to these concerns, he posted an open letter to the Law School supporting the group's rights to express itself, and noting that removing WHS's posters could violate the Law School's disciplinary code.  (*Id.* at 75.)

75.   Reinstein also posted the following open letter concerning WHS:

To the Law School Community:
        A small number of students who identify themselves as the Western Heritage Society have repeatedly posted messages of vitriol and hatred in the building.  Their apparent purpose is to verbally assault individuals and groups within our community.
        The Law School does not have a speech code that prohibits hateful expression.  I firmly believe that such prohobitions would be wrong and counter-productive.  An academic community must allow the widest latitude for free speech - even speech that tests the outer limits of tolerance.  The expression of ideas that we despise cannot be suppressed without endangering those we embrace.
        However, legal protection should not be confused with moral approval.  The members of the Western Heritage Society should not be left in doubt that the practice of expressing hate speech is reprehensible; that it disqualifies them from being considered serious participants in legitimate political debate; and that their efforts to degrade others serve to discredit and diminish themselves.
(Tr. Ex. D-11.)

76.   A WHS member posted a response to Reinstein's open letter throughout the Law School.  (Tr. 6/29/04 at 103.)

## II.   LEGAL STANDARD

It is not contested that Plaintiff was exercising his rights under the First Amendment when the CPD officers asked him to stop leafleting on University property during the 1997 and 1998 commencement exercises.  The issue here is whether Defendants' actions violated Plaintiff's First Amendment rights.  "The extent to which the government may limit activity protected by the First Amendment depends largely on the locale where the speech or conduct takes place."  *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports and Exposition Auth.*,

10

691 F.2d 155, 159 (3d Cir. 1982).  The permissible standard of conduct under the First

Amendment varies depending on whether the property in question is a public or non-public

forum.  The government has more latitude to limit expression under the First Amendment in an

area designated as a nonpublic forum than it does in a public forum.  *Id.* at 159-60.  The Court

previously determined in this case that McGonigle Hall and the Apollo building, the areas where

Plaintiff attempted to distribute leaflets during the 1997 and 1998 graduation ceremonies, are

nonpublic forums.  *Sabatini*, 2000 U.S. Dist. LEXIS 10797, at *8-9.

    Where property has been found to be a nonpublic forum, the government's restrictions on

speech "must be reasonable and 'not an effort to suppress expression merely because public

officials oppose the speaker's views.'"  *United States v. Kokinda*, 497 U.S. 720, 730 (1990)

(quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)); *see also*

*Widmar v. Vincent*, 454 U.S. 263, 277 (1981) (recognizing "a University's right to exclude even

First Amendment activities that violate reasonable campus rules or substantially interfere with

the opportunity of other students to obtain an education.").  In *Kokinda*, the Supreme Court

explained that "'[c]ontrol over access to a nonpublic forum can be based on subject matter and

speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by

the forum and are viewpoint neutral.'"  *Kokinda*, 497 U.S. at 730 (quoting *Cornelius v. NAACP*

*Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).  Therefore, our decision in this case

rests upon whether the University's policy regarding the treatment of expressive activities at the

Temple commencement ceremonies, and its enforcement of this policy as to Plaintiff and WHS,

was reasonable and content neutral.

## III.    DISCUSSION

A.       Was Defendants' Policy Content Neutral?

This case generally involves the environment in the late 1990's at Temple's Beasley

School of Law related to the First Amendment and specifically related to the graduation

ceremonies in 1997 and 1998.  Plaintiff claims that the CPD officers prohibited him from

distributing leaflets at these graduations because of the content of the leaflets, and because of the

poor relationship between WHS and the Law School administration.  Defendants contend that

they have a policy of prohibiting the distribution of written materials at events, such as

graduations, that are not part of the school event.  (Tr. Ex. D-1.)  They contend that this

prohibition does not take into consideration the content of the materials.

1.       Enforcement of Policy as to Plaintiff's Activities

The evidence does not support Plaintiff's contention that he was prohibited from

distributing leaflets based on the content of the leaflets.  To determine whether a restriction is

content neutral, "we look to the purpose behind the regulation; typically, 'government regulation

of expressive activity is content neutral so long as it is *justified* without reference to the content

of the regulated speech.'"  *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (quoting *Ward v. Rock

Against Racism*, 491 U.S. 781, 791 (1989)).  At the time of the incidents giving rise to this

lawsuit, the University had a stated policy regarding the regulation of speech on its property.

That *Open Forum (Free Speech) Policy* provided that:

> The University may . . . regulate the time, place and manner
> that its facilities are used, for the convenience of students, faculty, and
> staff.  There are places in the University which are used for purposes
> incompatible with their being opened as a 'public forum.'  Time, place
> and manner restrictions must be applied reasonably and not for the
> purpose of discriminating against certain persons or groups because of
> the content of the message they wish to convey.

12

(Tr. Ex. D-1.)  On its face, the stated policy and the testimony of the CPD officers at trial establish that the policy was content neutral.  While the policy does not state specifically how the CPD is to deal with leafleting at graduation, CPD's practice is to not allow anybody to distribute written materials or to engage in other expressive activities on University property during graduation ceremonies.  (Tr. 6/29/04 at 113, 125, 152.)   This is not unreasonable.

A general policy like the *Open Forum (Free Speech) Policy* may result in inconsistent enforcement.  However, Robert Lowell, head of the CPD Investigations Unit, testified "that we cannot discriminate, that we have to allow people to express their opinions but we also have to take and can take into consideration time, place and manner."  (*Id.* at 111.)  He further explained that he "wanted to make sure that everyone is treated consistently . . . ."  (*Id.* at 117.)  Although no specific written policy was given to CPD officers regarding the treatment of individuals who want to exercise their First Amendment rights on University property, the policy for dealing with such situations was given to individual officers orally.  (*Id.* at 162-63.)

Plaintiff contends that the actions of CPD were part of a larger effort on the part of the University and the Law School to suppress his speech.  However, Plaintiff has not established through direct or circumstantial evidence that Defendants instructed the CPD officers to prevent him from distributing his leaflets.  Plaintiff's claims of content-based discrimination rely on:  (1) the fact that CPD officers allegedly looked at the leaflets before directing him to stop distributing them at the graduation ceremonies; and (2) the prior instances where Plaintiff and other members of WHS were allegedly subjected to similar content-based censorship.

Plaintiff claims that CPD officers asked him to move to the sidewalk after they reviewed

13

the content of his leaflets.  (Second Am. Compl. ¶ 29.)  He contends that they were trying to stifle his speech, rather than simply enforcing the University's policy.  This contention is contradicted by the testimony of each of the CPD officers who directed Plaintiff to leave McGonigle Hall and the Apollo building.  Lowell and Bergman both denied looking at Plaintiff's leaflets before ordering him to stop distributing leaflets and ordering him to move to the public sidewalk.  (Tr. 6/29/04 at 117, 122, 151.)

Even if we were to accept Plaintiff's testimony that CPD officers did look at the leaflets before acting (*id.* at 45-46, 70-71), the evidence does not support Plaintiff's suggested inference that the content of the leaflets caused them to act.  The CPD was not under the authority of Reinstein or the Law School.  (*Id.* at 110, 206.)  Moreover, Plaintiff offered no evidence showing that other groups or individuals were allowed to do things that Plaintiff was prevented from doing.  In fact, Lowell and Bergman were not aware of anyone ever being permitted to distribute materials not related to the event during graduation ceremonies at McGonigle Hall or the Apollo building.  (*Id.* at 125, 152.)  The testimony produced at trial simply failed to show that Plaintiff was treated differently because of the content of the leaflets he sought to distribute at the 1997 and 1998 graduation ceremonies.

       2.     *Asserted Evidence of A Pattern of Discrimination Against Plaintiff and WHS*

To support the claim that he was treated differently because of his speech, Plaintiff offers several incidents that he contends indicate that Defendants selectively restricted WHS's ability to communicate with members of the University community, and that the discrimination at the 1997 and 1998 graduations was a part of this pattern.  However, it is clear that Defendants' actions

14

related to each of the "incidents" proffered by Plaintiff were the result of considerations other than an impermissible motive.

The first alleged instance of discrimination occurred when WHS sought to publicize a speaker it was bringing to campus.  Under SAC policy, student groups were to bring fliers advertising an event to the SAC to be approved, stamped, and distributed.[4]  (Tr. 6/29/04 at 22; Tr. 6/30/04 at 10.)  On one particular occasion, Plaintiff brought fliers to SAC to be approved and distributed.  The fliers were not distributed.  (Tr. 6/29/04 at 22.)  However, there is no evidence that these fliers were not posted because of their content or the viewpoint of WHS.  Rather, the evidence established that the fliers were not posted because the SAC office had a shortage of staff.  (Tr. 6/30/04 at 37.)  After this incident, a meeting was held that included: WHS; Walter Brady, former Director of Student Activities; Wiernicki; and a law school professor attending the meeting at WHS's request.  It was subsequently determined by SAC that WHS had not been treated unfairly.  (*Id.*)[5]

The second incident involved another attempt by WHS to distribute fliers.  There is a table in the SAC office, staffed by a University employee, where student groups may place literature for other students to read.  On the day in question, Plaintiff intended to place WHS's fliers on the table.  (Tr. 6/29/04 at 53-54.)  When Plaintiff attempted to place these fliers on the

---

[4]  According to Kristl Wiernicki, former Associate Vice President for Student Affairs and Dean of Students, the purpose of this policy was to "balance the interests of all the folks who wanted to post information with the limited resources that we had."  (Tr. 6/30/04 at 31.)

[5]  Both Wiernicki and Brady received several complaints from WHS concerning the actions of the SAC staff, and after investigating these complaints, neither administrator concluded that WHS was subject to discrimination.  (Tr. 6/30/04 at 12-14, 16-18, 35-36.)  Moreover, Brady admitted that if he became aware of any such discrimination, he would not have allowed it to continue.  (*Id.* at 12.)

table, the University employee told him that the materials had to be stamped before they could be distributed. (*Id.* at 54.)  Plaintiff believes that he was prevented from distributing these fliers because of their content and not because they lacked a stamp.  This belief is based on the fact that:  (1) the fliers were printed on WHS's trademark red paper; and (2) there was material on the table that was not stamped.  This material was not identified.  (*Id.* at 53-54.)

Plaintiff's allegations that WHS was the subject of discrimination in this instance is pure conjecture.  He does not know the name of the student/employee who was working at the table, and he has no information that the student/employee was instructed to not allow WHS to place their materials on the table.  Moreover, the policy was clearly established that "if [materials are] going to be displayed on a table, if they're going to be posted on a bulletin board, they needed proper attribution, they needed to be stamped, and only under those circumstances could we allocate the limited space of that information table for stacks of material."  (Tr. 6/30/04 at 39.)[6]

The third incident involved WHS's request for additional bulletin board space at the Law School.  The Law School had a dedicated area for bulletin boards where various student groups received designated space.  (Tr. 6/29/04 at 56.)  When Plaintiff was serving as President of WHS in 1995, he noticed that another student group, the Environmental Law Council, had begun using two bulletin boards.  Plaintiff wrote two letters to Adelaide Ferguson, former Assistant Dean for Student Affairs and Assistant Dean for Graduate and International Programs, requesting an

---

[6]  Despite the articulated policy, Wiernicki admitted that "it was not unusual for groups, individuals, even faculty members to bring materials thinking that they could use [the table] as a freestanding publicity center and, without even asking whether there was a procedure, they might drop materials there . . . ."  (Tr. 6/30/04 at 40.)  However, this evidence is insufficient to support Plaintiff's claim that Defendants prevented him from disseminating WHS information because of its content.

additional bulletin board for WHS.  (*Id.* at 56; Tr. Ex. P-3.)  Plaintiff never received a response to

his request.  (Tr. 6/29/04 at 58.)  When questioned about this, Ferguson did not recall ever

receiving a request for use of a second bulletin board.  (*Id.* at 205.)  However, since the bulletin

board space was allocated by the Student Bar Association ("SBA"), any lack of action taken on

Plaintiff's request was likely the fault of SBA.  (*Id.*)  Plaintiff did not know whether the

Environmental Law Council had obtained permission to use additional bulletin board space.  (*Id.*

at 93.)

   The fourth incident cited by Plaintiff to illustrate disparate treatment involved the banning

of easels used as display space for student groups near the front of the Law School building.

There is an area near the entrance of the Law School where various groups have used easels to

post notices about events.  (*Id.* at 56.)  After Plaintiff placed an easel in that area to advertise

WHS events, the Law School decided to remove all of the easels.  (*Id.* at 56, 200.)  Sabatini

believes that the administration's decision to remove them was related to WHS's use of an easel.

Again, this is pure conjecture.  Reinstein; Assistant Dean Ferguson; and Assistant Dean Deborah

Feldman, Assistant Dean for External Affairs, all participated in the decision to remove the

easels.  Each witness confirmed that the decision to remove the easels was based on the fact that

the number of easels had increased to the point where they began to obstruct access to the main

entrance to the Law School.  (*Id.* at 197-200; Tr. 6/30/04 at 51-52, 85-86.)  Moreover, Assistant

Dean Feldman had been warned by the fire marshal that the easels presented a safety hazard.  (Tr.

6/30/04 at 52.)

   The fifth incident that Plaintiff cites involves WHS's attempt to reserve a room for a

guest lecture.  A student group was required to reserve a room in order to sponsor a guest speaker

at the Law School.  In this particular instance, WHS requested a room and was told that it would

cost one thousand dollars ($1000) to configure it for a lecture.  (Tr. 6/29/04 at 58-59.)  Plaintiff

suggests that the fee was used to prevent WHS from holding its lecture.  (*Id.* at 59-60.)

Plaintiff's speculation is not supported by any evidence.  As Plaintiff himself stated, all of the

lecture rooms were unavailable for the time and date that Plaintiff sought to hold the event.  (*Id.*

at 104.)  The only room available for this use was the faculty meeting room.  (*Id.* at 223.)  Since

this room was usually used for meetings, the furniture had to be completely rearranged for the

lecture.  Because the University employs union labor, the Law School is required to use union

workers to move any furniture.  (*Id.* at 224.)  When WHS requested this room, Dorothy Lee,

Director of Special Events, requested an estimate from Facilities Management and then gave the

estimate to WHS.  (*Id.*)  Even though the charge for moving the furniture was significant, there

was nothing that the Law School administration could do to alter this charge.  (*Id.* at 224-25, 53-

54.)  The costs would have been the same for any campus organization.

The sixth incident that Plaintiff offers in support of his position that WHS was receiving

disparate treatment is a 1995 incident in which WHS attempted to hold a lecture at the Law

School that was open to non-law school students.  At the time, it was the Law School's policy

that the names of any non-law school students who would be attending a lecture on campus had

to be submitted in advance of the event.  (Tr. 6/30/04 at 87.)  The purpose of the policy was to

increase security and to prevent theft.  (*Id.* at 87-88.)  Plaintiff does not dispute the existence or

purpose of the policy.  Rather, Plaintiff believes that the policy was not enforced equally.  In

1995 and 1996, the Black Law Students Association ("BLSA") held two lectures at the Law

School in the moot court courtroom.  In connection with these events, Plaintiff offered posters

18

advertising the event that invited all University students to attend. (Tr. 6/29/04 at 61; Tr. Exs. P-4, P-5.) Even accepting as true that the BLSA held lectures open to non-law school students, there is no evidence to support the conclusion that this practice was authorized by the administration. In fact, Assistant Dean Ferguson testified that she had no knowledge that BLSA events were advertised as open to non-law students, (Tr. 6/29/04 at 203-04), and if she had become aware of this she would have advised the group of the guest list policy. (*Id.* at 203).[7]

Plaintiff asserts that he and WHS were treated differently than other groups in these prior instances because of the content of their speech. The weight of the evidence simply does not support this assertion. This is not to say that Plaintiff and WHS were held in high regard at the Law School. (Tr. 6/30/04 at 71-72.) A number of students were offended by WHS's activities and complained to the Dean about those activities.

Despite the complaints that Reinstein received, he ultimately refused requests to discipline WHS. This refusal was based on the value he placed on the freedom of expression.

Reinstein drafted the *Open Forum (Free Speech) Policy* at issue in this case.[8] (*Id.* at 67.) The principal value behind the policy is "that the university cannot suppress expression because it is considered offensive." (*Id.* at 68, 70.)

---

[7] The fliers advertising the BLSA events were not stamped or "approved" by the Law School. They were approved by SAC. (Tr. 6/29/04 at 204.) The Law School administration is not informed about what fliers are approved by SAC. (*Id.*)

[8] The Policy was drafted in response to a controversy that ensued after the military sought to recruit law students. (Tr. 6/30/04 at 67.) The Law School sought to ban the military from recruiting because the military prohibited homosexuals from enlisting. (*Id.*) Ultimately, the University Board of Trustees overruled the Law School administration. (*Id.*) This controversy led to the creation of the policy. Reinstein noted that, at the time of the enactment of the policy, many universities were debating whether to have speech codes and make "hate speech" a disciplinary violation. (*Id.* at 68-69.) Temple ultimately enacted a free speech policy.

19

Reinstein was very familiar with Plaintiff, Lincoln Herbert, and WHS.  Despite the complaints that he received concerning the group, he supported its existence and the right of its members to express themselves.  In support of WHS, Reinstein insisted that the SBA approve recognition of the organization, which would allow it to receive funding from the SBA.  (*Id.* at 74-75.)  In response to complaints from Herbert that students were tearing down WHS's posters, the Dean posted an open message to the student body supporting the group's right to express itself, and noting that tearing down posters could possibly violate the disciplinary code.  (*Id.* at 75.)

After weighing all of the evidence, we are compelled to conclude that the restrictions placed on Plaintiff's First Amendment Rights were not content based.  Despite the reputation of WHS in the Law School community, and Plaintiff's perception that some kind of conspiracy of discriminatory action was being taken against the organization, we conclude that the officers who asked Plaintiff to hand out the leaflet on the public sidewalk were simply doing their job enforcing campus policy without regard to the content of the speech.

### B.      Were the Restrictions on Plaintiff's Speech Reasonable?

Any restrictions placed on Plaintiff by the CPA officers during the 1997 and 1998 graduation exercises must be reasonable.  *See Kokinda*, 497 U.S. at 730; *see also Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 683 (1992).  During Temple's graduations in 1997 and 1998, ceremonies were being held successively.  (Tr. 6/29/04 at 117.)  As a result, many people would be leaving a graduation ceremony while many more people were preparing to attend the next ceremony.  (*Id.*)  The University's general policy against allowing individuals to distribute materials at Temple graduation ceremonies was intended to ensure that those attending

the events could enter and exit the buildings safely.  (*Id.* at 117, 146, 171.)  As Lowell explained, the campus police wanted "to make sure no one tripped" and "to make sure that whatever was taking place couldn't escalate."  (*Id.* at 117.)  There was a concern that allowing persons to distribute materials that are not related to the graduation creates safety concerns because attendees "get the impression that those individuals are working for Temple, handing out things for Temple.  What I've watched happen is people line up and think they have to get a catalog or a hand-out for the event there. . . . [P]eople then start seeing someone giving something out and everybody has to line up and it starts to block the [entrance]."  (*Id.* at 165.)  Safety was the primary consideration.  (*Id.* at 168.)

The restrictions placed on Plaintiff's First Amendment rights during the 1997 and 1998 commencement ceremonies were perfectly reasonable.  Plaintiff attended the 1997 Law School graduation ceremony with the intention of distributing leaflets that were critical of Reinstein and the Law School.  (*Id.* at 24-25.)  He began distributing the leaflets inside McGonigle Hall in the middle of the outer lobby area.  (*Id.* at 26-27.)  CPD officers informed Plaintiff that he could not distribute the leaflets in the outer lobby.  (*Id.* at 71.)  After Plaintiff asked to speak to a CPD supervisor, Lowell told Plaintiff that he could not distribute the material inside McGonigle Hall (*id.* at 32, 116), and directed him to the bottom of a set of stairs on the south side of the building, which was on a University sidewalk.[9]

---

[9]  Once he reached the bottom of the steps during the 1997 ceremony, Plaintiff asserts that he was directed by Gail Johnson, a detective, to step off of the University sidewalk and onto the adjacent public sidewalk.  (Tr. 6/29/04 at 36-37.)  No other witness corroborated Plaintiff's testimony in this regard.  However, even if we credit Sabatini's testimony, we conclude that the restriction imposed on him was a reasonable time, place, and manner restriction on his speech because the restriction was content neutral, it was narrowly tailored to serve a significant government interest, and Plaintiff had ample alternative channels of communication (*id.* at 37, 74).  *See Perry*

Plaintiff and Herbert attended the 1998 Law School graduation at the Apollo building with the intention of again distributing leaflets critical of Reinstein and the Law School. (*Id.* at 41-43.) Lowell and Bergman observed Herbert distributing leaflets on the steps of the Apollo building and allowed him to continue to distribute his materials at that location. (*Id.* at 120-21, 128, 149-50.) Herbert then went inside the Apollo building to join Plaintiff, who was distributing leaflets in the outer lobby. Plaintiff and Herbert were told that they could not distribute anything inside the building. (*Id.* at 121.) Lowell and Bergman did not look at the leaflets before Plaintiff and Herbert were told they could not distribute anything inside the building. (*Id.* at 122, 150-51.) Ultimately, Plaintiff moved to the public sidewalk to distribute leaflets. (*Id.* at 49.)

During both ceremonies, reasonable limits on Plaintiff's leafleting activity were imposed. In conformity with prior practice, the CPD officers asked Plaintiff to leave the venue where graduation was taking place and directed him to distribute his materials on the sidewalk. "The government need not wait until a dangerous situation develops to restrict access in a nonpublic forum. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *United States v. Bjerke*, 796 F.2d 643, 650 (3d Cir. 1986) (citation and alteration omitted). Therefore, Temple was not required to wait until Plaintiff's activities created a safety problem. Furthermore, "'[t]he Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'" *Kokinda*, 497 U.S. at 730 (quoting *Cornelius*, 473 U.S. at 808). As a result, it is of no consequence that

---

*Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Plaintiff felt that his new location was less effective than his previous location inside the outer lobby of each venue.  In each instance, the University imposed reasonable limits on his leafleting and those limits were content neutral.

An appropriate order follows.


**BY THE COURT:**

<u>/s/</u> ***R. BARCLAY SURRICK, J.***